Brian A. Ertz (ISB No. 9960)
brian@ertzjohnson.com
Eileen R. Johnson (ISB No. 9935)
eileen@ertzjohnson.com
P.O. Box 665
Boise, Idaho 83701
(208) 918-1663 (Telephone)
(208) 416-6665 (Fax)
*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

|  |  |
|---|---|
| **RENEE JOHNSON**, next friend and guardian of **K.G.**, an incompetent adult, | Case No.   1:19-cv-317 |
| *Plaintiff,* | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| **LAW PROPERTY MANAGEMENT, LLC** *d.b.a* **LAW PROPERTY MANAGEMENT**; **RANDY HOFFER**; **BOBBIE VAUGHN**; *and* **JOHN AND JANE DOES, I-XX**, *whose identity is unknown*, | |
| *Defendants.* | |

COMES NOW Plaintiff Renee Johnson on behalf of her daughter, K.G., an incompetent adult, by and through her undersigned counsel of record, for causes of action against the above-named Defendants, complaining and alleging as follows:

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this action arises under the laws of the United States, namely 42 U.S.C. §§ 3604 and 3613.

2.      This Court has supplemental jurisdiction to hear and determine Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts.

3.      Plaintiffs' state law claims arise under Idaho's Manufactured Home Residency Act, Idaho Code § 55-2001 *et seq.*

4.      Plaintiffs' state law claims are related to the federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this District.

6.      Based on the allegations set forth herein, the Court has personal jurisdiction over all Defendants in this action.

## PARTIES

### *Plaintiff*

7.      Plaintiff Renee Johnson (hereinafter "Plaintiff") is now, and at all times relevant herein was, a resident of Ada County, State of Idaho.

8.      Plaintiff is the mother and court-appointed guardian for K.G., an incompetent adult who is "handicapped" as that term in defined by the FHA.

9.      K.G. is a resident of *Demar Park*.

10.     *Demar Park* is located at 411 E. 43rd Street in Garden City, Idaho.

11.     Plaintiff and K.G. own the mobile home in which K.G. resides.

12.     The mobile home is on a mobile lot within *Demar Park*.

13.     Plaintiff and K.G. lease the mobile home lot at *Demar Park* from Defendant Law

Property Management, LLC and Defendant Hoffer.

### *Defendants*

14.     Defendant Randy Hoffer ("Defendant Hoffer") is now, and at all times relevant

herein was, a resident of Ada County, State of Idaho.

15.     Defendant Hoffer owns and controls *Demar Park*.

16.     Defendant Law Property Management, LLC (hereinafter "Defendant Law") was

an Idaho Corporation doing business in Ada County and Canyon Counties, State of Idaho until

November 13, 2018.

17.     Defendant Law is a limited liability company doing business in Ada and Canyon

Counties, State of Idaho, since November 13, 2018.

18.     Defendant Law's assumed business name is Law Property Management.

19.     Defendant Law's business address is 940 N. Cole Road, Boise, Ada County,

Idaho.

20.     The registered agent for Defendant Law is Eugene Weinstine, 940 N. Cole Road,

Boise, Idaho 83704.

21.     Defendant Law is the managerial agent for Defendant Hoffer with respect to

multiple mobile homes and mobile home parks throughout Ada County and Canyon County.

22.     Defendant Law manages Demar Mobile Home Park (hereinafter "Demar Park"),

COMPLAINT AND DEMAND FOR JURY TRIAL                                              3

located at 411 E. 43rd Street, Garden City, Ada County, Idaho.

23.     Defendant Bobbie Vaughn (hereinafter "Defendant Vaughn") is an employee of Defendant Law.

24.     Defendant Vaughn manages Defendant Law's mobile home park lot leases, including the lots in Demar Park.

25.     Defendant Vaughn's direct supervisor is Eugene Weinstine, the President of Defendant Law.

26.     Defendant Law was acting as the agent of Defendant Hoffer at all times relevant to Plaintiff's allegations against Defendants.

27.     Defendant Vaughn was acting as the agent of Defendant Law at all times relevant to Plaintiff's allegations against Defendants.

28.     Defendant Vaughn was acting as the agent of Defendant Hoffer at all times relevant to Plaintiff's allegations against Defendants.

29.     Defendant Hoffer is liable for the acts and omissions of Defendant Law pursuant to the FHA and the doctrine of *respondeat superior*.

30.     Defendant Law is liable for the acts and omissions of Defendant Vaughn pursuant to the FHA and the doctrine of *respondeat superior*.

31.     Defendant Hoffer is liable for the acts and omissions of Defendant Vaughn pursuant to the FHA and the doctrine of *respondeat superior*.

## STATEMENT OF FACTS

32.     The mobile home lots in Defendants' mobile home parks, including Demar Park, have driveways or otherwise ample space within each mobile home's curtilage to park at least one vehicle without impeding the movement of vehicles through the parks.

33.     At least one tenant of Demar Park is handicapped (hereinafter "disabled") as that term is defined by the Fair Housing Act.

34.     Other mobile home parks owned and/or managed by the Defendants have disabled tenants.

35.     Defendants know or should know that some tenants residing in their mobile home parks, including Demar Park, are disabled.

36.     Some tenant invitees are medically necessary in-home care providers.

37.     Defendants know or should know that some tenant invitees, including the invitees of at least one tenant of Demar Park, are medically necessary in-home care providers.

38.     Prior to August 2017, tenant invitees would generally park in the driveway or curtilage of the tenant's mobile home, or along the main drive into the Defendants' mobile home parks, near the tenant's mobile home.

39.     Prior to August 2017, Defendant Law required each tenant to provide detailed information for each vehicle the tenant owns, including the license plate number and current registration of each vehicle.

40.     Therefore, if necessary, Defendant Law had sufficient information in its records to determine if a vehicle belonged to one of its mobile home park tenants, or an invitee.

41.     There are no designated parking spaces for disabled invitees in Defendants' mobile home parks, including in Demar Park.

42.     The main driveways into the Defendants' mobile home parks, including Demar Park, are gravel or aged asphalt with potholes, cracks, or other deterioration.

43.     Many of Defendants' mobile home parks, including Demar Park, have insufficient lighting after dark to ensure safety, whether from inadequate numbers of light fixtures, or poorly

maintained bulbs or electrical issues.

44.    Many of Defendants' mobile home parks' common areas, including those in Demar Park, have overgrown trees and shrubs, or the landscaping is positioned in a manner that provides ample space for an individual to be concealed from view.

45.    Defendant Law does not provide snow plowing or ice removal in its mobile home parks, including Demar Park.

46.    During winter months, Defendants' mobile home park main driveways are often slippery and unsafe to walk on, including that in Demar Park.

47.    As one would expect, each of Defendants' mobile home parks, including Demar Park, include mobile homes situated in close proximity to a main public road, and mobile homes situated at quite a distance from a main public road.

48.    Some of Defendants' mobile home parks, including Demar Park, have a single dead-end main driveway.

49.    Entry to Demar Park is from a two-lane public road.

50.    Prior to August 2017, tenants and their invitees had been parking inside Defendants' mobile home parks, including Demar Park, for years without incident.

### *Defendant Law Implements a New Parking Policy in its Mobile Home Parks*

51.    In August 2017, Defendant Vaughn mailed a letter (hereinafter "August 2017 Letter") to tenants in Defendants' mobile home parks, including Demar Park.

52.    The *August 2017 Letter* states, "I'm giving you a courtesy letter to let you know that all our mobile home parks are permit parking only.  You will need to come into the office with all your registrations out of your vehicles in order to get your permits.  If you do not have a permit on your car, it will get towed on August 17, 2017 and thereafter."

53.    The *August 2017 Letter* was signed by Defendant Vaughn.

54.    The *August 2017 Letter* appears to indicate that all of Defendant Law-managed mobile home parks were already designated as "permit parking only."

55.    Defendant Law had not previously notified its tenants of any such policy.

56.    Defendant Law provided its mobile home tenants one week's notice of the implementation of its permit parking policy (hereinafter "Parking Policy"), which took effect on August 17, 2017.

57.    The *August 2017 Letter* provided tenants one week in which to obtain parking permits from Defendant Law at its office in Boise, Ada County, Idaho.

58.    The *August 2017 Letter* was the first correspondence sent to tenants regarding the Parking Policy.

59.    Although Defendant Law is ostensibly "open" during business hours, the office is frequently locked and closed because Defendant Vaughn and Defendant Law employee Steve Feaster work "out in the field" often.

60.    Defendant Law does not have a schedule for such absences and Plaintiff and/or other tenants have driven to Defendant Law's office during regular business hours only to find the office empty and locked.

61.    Defendant Vaughn stated to at least one mobile home tenant that she would not keep the office open to accommodate such tenants.

62.    Defendant Law did not provide a notice to mobile home tenants, including Plaintiff, of the rule change as required by I.C. § 55-2008(2).

63.    Defendant Law did not place parking prohibition signs in each of its mobile home parks until days, weeks, and/or months after the Parking Policy had been implemented.

COMPLAINT AND DEMAND FOR JURY TRIAL                                            7

64.    Defendant Law did not formally communicate to its tenants, including Plaintiff, a justification for the sudden implementation of its Parking Policy in August 2017.

65.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that without exception all tenant invitees would be required to park on the main roads outside of the mobile home parks it manages.

66.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that the blanket rule excluding all invitees from parking in the parks applied to disabled invitees and medically necessary tenant care-giver invitees.

67.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that all vehicles without parking permit stickers were required to park on the main roads outside of the mobile home parks it manages even if Defendant Law had previous knowledge that a vehicle belonged to a tenant, without exception.

68.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that despite Defendant Law having in its possession the license plate number and a copy of each vehicle's current registration, Defendants' parking permit sticker was required to be affixed to all vehicles parked in its mobile home parks, without exception.

69.    Defendant Law did not formally communicate to its tenants, including Plaintiff, where each was required to park once a tenant obtained a parking sticker, despite its strict new rule that each permitted vehicle must be parked only in a designated parking spot within each park.

70.    Defendant Law did not visit its mobile home parks, including Demar Park, to demarcate new parking spaces for tenants whose lots do not have driveways.

71.    Defendant Law did not formally communicate to its tenants, including Plaintiff,

that Defendant Law would charge fees, nor the amount of those fees, for parking sticker replacements unless the tenant brought the old sticker back to Defendant Law for an exchange.

72.    Defendant Law did not formally communicate to tenants that own more than one vehicle whether and how a tenant could obtain additional parking stickers for the additional vehicle(s).

73.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that only tenant-owned vehicles can be permitted and that borrowed or temporary vehicles are not allowed to park inside of Defendant Law's mobile home parks, without exception.

74.    Defendant Law did not formally communicate to its tenants, including Plaintiff, which towing companies Defendant Law would engage, to allow a tenant or tenant invitee to locate vehicles if the vehicle was towed.

75.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that towing companies hired by Defendant Law would be driving through the mobile home parks, including Demar Park, on a regular basis, day and night, to remove any vehicle that was parking in violation of Defendant Law's Parking Policy.

76.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that in addition to towing Defendant Law would be implementing wheel booting as an alternative to towing, or what a tenant or tenant invitee should do if a wheel boot was discovered on a vehicle.

77.    Defendant Law did not formally communicate to its tenants, including Plaintiff, that in addition to towing, any tenant Defendant Law deemed to be in violation of the vague Parking Policy would receive a lease violation notice fee of $50.00.

78.    Defendant Law did not formally communicate to its tenants, including Plaintiff,

that in addition to tow trucks Defendant Law representatives would be actively driving through Defendants' mobile home parks, including Demar Park, to photograph vehicles Defendant Law deemed to be in violation of the Parking Policy as a basis for lease violation notice fines.

79.     Plaintiff did not receive another written communication regarding the Parking Policy from Defendant Law after the *August 2017 Letter*.

80.     Upon information and belief, some tenants did not receive the *August 2017 Letter*.

81.     Aside from the basic communication in Defendant Vaughn's *August 2017 Letter*, Defendant Law did not act to provide information to its tenants, including Plaintiff, about the very strict requirements and consequences for non-compliance with Defendant Law's Parking Policy.

82.     According to Defendant Vaughn, many tenants did not obtain parking passes during the seven-day period Defendant Law provided.

83.     Upon information and belief, Defendant Law made no attempts to follow up with those tenants that did not obtain a parking pass within the seven days following the *August 2017 Letter*.

84.     There was no discernable reason for the extensive restrictions imposed by the Parking Policy.

85.     There was no discernable reason for Defendant Law's expedited implementation of the Parking Policy.

86.     Defendant Law was in control of the timing of its implementation of the Parking Policy.

87.     Defendant Law was in control of how and to what degree it would directly pursue Parking Policy violators after the August 17, 2017 deadline.

88.     Defendant Law was in control of whether to provide warnings to Parking Policy violators for a period of time after August 17, 2017 to alleviate the foreseeable harm likely to result from one week's notice of a sudden policy change.

89.     Defendant Law was in control of contracting with towing vendors and directing those vendors with respect to the commencement date of towing and wheel booting.

90.     Defendant Law was in control of its decision to engage towing vendors to actively patrol its mobile home parks, including Demar Park, around the clock to search for *Parking Policy* violators.

91.     Defendant Law offered its mobile home park tenants, including Plaintiff, no warnings or grace periods after August 17, 2017.

92.     Plaintiff observed that Defendant Law appeared to have taken the stance that, if a tenant didn't bother to come get a parking pass, the tenant was to blame for the consequences.

93.     Some of Defendant Law's tenants "learned the hard way" when they received $50.00 lease violation notices accompanied by photographs Defendant Law representatives had taken of the tenants' vehicles.

94.     Some of Defendant Law's tenants "learned the hard way" when they received $50.00 lease violation notices because an invitee's vehicle had been spotted inside of the mobile home park, even when the invitee's vehicle was in the tenant's driveway at the time of the "violation."

95.     Some of these invitees were medically necessary in-home care providers.

96.     Some of Defendant Law's mobile home park tenants "learned the hard way" when they and/or their invitees discovered wheel boots had been placed on their vehicles.

97.     Some of these invitees were medically necessary in-home care providers.

98.     Some of Defendant Law's mobile home park tenants "learned the hard way" when they and/or their invitees discovered that their vehicles had been towed.

99.     Some of these invitees included medically necessary in-home care providers.

100.    In addition to the *August 2017 Letter*, Defendant Law representatives informally, inconsistently, and verbally communicated portions of the information to only some of its tenants.

101.    Tenants, including Plaintiff, have been confused by the different instructions from different Defendant Law representatives at different times regarding the Parking Policy.

102.    Many tenants sought information about the Parking Policy from other tenants due to varying messages from Defendant Law, which caused additional confusion and misinformation.

103.    Defendant Law appeared to Plaintiff to be "making the rules up as it goes," with respect to the Parking Policy.

104.    One tenant attempted to obtain a Parking Permit from Defendant Law but was turned away because Defendant Law's employee was too busy to issue the permit.

105.    The tenant left without a parking permit.

106.    Soon thereafter, the tenant was served a lease violation notice fine of $50.00 for failing to display a parking permit sticker as required by the Parking Policy.

107.    Another tenant received a lease violation fine for parking in front of his mobile home.

108.    The tenant's neighbor also received a lease violation notice fine of $50.00 for parking in front of *his* home.

109.    When the tenants attempted to resolve the matter, Defendant Law firmly denied it

COMPLAINT AND DEMAND FOR JURY TRIAL                                           12

had made an error.

110.    Days later, Defendant Law changed its position and confirmed that the tenants were indeed parking in the correct locations within the mobile home park, only after the tenants continued to urge Defendant Law to reverse the fines.

111.    Upon information and belief, since the implementation of the Parking Policy, Defendant Law has not changed its lease agreements to include terms or provisions that would inform a new tenant of the strict prohibitions of the Parking Policy.

112.    Upon information and belief, tenant lease agreements executed after the implementation of the Parking Policy do not include terms or provisions to inform new tenants of the rules and prohibitions imposed by the strict policy.

113.    Upon information and belief, Community Rules provided to new tenants by Defendant Law as required do not include the strict Parking Policy provisions or the consequences of violations of the Parking Policy.

114.    When Defendant Vaughn visits Demar Park, she parks in fire lanes or other areas prohibited for parking by the Parking Policy.

### *Consequences of Defendant Law's Parking Policy*

115.    Because Defendant Law prohibits any tenant invitee from parking within any of Defendant Law's mobile home parks, invitees must park on the street outside of the mobile home parks.

116.    This causes visual obstruction for vehicles attempting to pull out onto or across the street from the mobile home parks.

117.    Narrowed public streets from parking inhibits emergency vehicles and increases likelihood of danger for drivers (pedestrians appearing between cars, narrowed lanes, etc).

COMPLAINT AND DEMAND FOR JURY TRIAL                                                13

118.    Some of the streets outside Defendant Law's mobile home parks have sidewalks while other streets do not.

119.    Tenants that do not have a parking permit, because the tenant has borrowed or rented a vehicle, or for any other reason, must park on the street outside of the mobile home park in which the tenant resides.

120.    Tenants and invitees forced to park on the street outside the mobile home parks, including Demar Park, must walk to and from the destination mobile home regardless of weather conditions, darkness, carrying groceries, etc.

121.    Tenants and invitees forced to park on the street outside a mobile home park, including Demar Park, must walk a significant distance in some cases to reach some mobile homes, depending on the size of a park and the location of the destination mobile home inside of the park.

122.    Tenants and invitees forced to park on the street outside a mobile home park, including Demar Park, are at risk for injury or crime due to snow and ice, darkness, overgrown landscaping, inadequate lighting, uneven park driveway surfaces, etc.

123.    Vehicles parked on the street outside of Defendants' mobile home parks, including Demar Park,  are at a greatly increased risk of damage, vandalism, and theft.

124.    A significant number of tenants, including Plaintiff, report that friends and family avoid visiting the tenants' homes due to Defendant Law's Parking Policy.

125.    Defendant Law requires that a parking permit sticker be affixed to each vehicle's windshield.

126.    If a tenant requires a new parking permit sticker due to change in vehicle, Defendant Law requires the tenant provide the old sticker to Defendant Law as a condition for

obtaining a new sticker.

127.    If a tenant does not provide the old parking permit sticker, Defendant Law assesses a fee against the tenant for the new parking permit sticker.

128.    Tenant vehicles have been towed from Defendant Law's mobile home parks or booted resulting in significant fees and fines to retrieve the vehicle.

129.    Lease violation fines of $50.00 are recharacterized as unpaid rent according to a provision in Defendant Law's lease agreement, and compounded with significant fees and interest, allowing Defendant Law to utilize the expedited eviction process available to landlords in Idaho if the tenant is unable to pay the $50.00 fine immediately.

### *K.G.*

130.    K.G. is an incapacitated adult with respect to her legal autonomy.

131.    K.G. is a "person" as that term is defined by 42 U.S.C. § 3602(d).

132.    K.G. is "handicapped'" as that term is defined by 42 U.S.C. § 3602(h) as she has mental and physical impairments which substantially limit one or more of K.G.'s major life activities.

133.    K.G. has a record of being "handicapped" as that term is defined by 42 U.S.C. § 3602(b).

134.    K.G. has been diagnosed with Autism, Anxiety, and PTSD and requires substantial support from behavioral caregivers on an around-the-clock basis.

135.    K.G. has also been diagnosed with Raynauds syndrome without gangrene and renal cysts.

COMPLAINT AND DEMAND FOR JURY TRIAL                                          15

136.     K.G. has marked difficulties with verbal and non-verbal communication, exhibits inflexibility in her behaviors, experiences distress when her routine is altered, and cannot care for her own physical safety.

137.     K.G. is incapable of caring for her own safety and does not understand or perceive potential danger.

138.     Plaintiff is K.G.'s legal guardian in all matters.

139.     Plaintiff advocates on K.G.'s behalf with respect to K.G.'s tenancy at Demar Park.

140.     Plaintiff purchased K.G.'s mobile home on K.G.'s behalf in 2013.

141.     Plaintiff leased K.G.'s mobile home lot from Defendant Law in June 2013.

142.     K.G.'s mobile home is a "dwelling" as that term is defined by 42 U.S.C. § 3602(b).

143.     K.G. lives alone in her home because she likes to be as independent as possible.

144.     K.G. does not drive and does not own a vehicle.

145.     K.G. requires the supervision and assistance of a medically necessary in-home care providers around the clock for K.G.'s safety and care.

146.     K.G. is a Medicaid recipient and has a Developmental Delay Waiver services, with an Individual Support Plan in place.

147.     K.G. receives medically necessary in-home care services through a local behavioral health organization.

148.     K.G.'s medically necessary in-home care providers rotate three (3) shifts, of eight (8) hours each, daily.

149.    K.G.'s medically-necessary in-home care providers are in the home overnight with K.G.

150.    Plaintiff visits K.G. often and remains in regular contact with K.G.'s medically necessary in-home care providers.

151.    In the four years prior to the implementation of Defendant Law's Parking Policy, K.G.'s medically necessary in-home care providers parked in the curtilage of K.G.'s home in Demar Park.

152.    This arrangement was optimal for K.G. as she had only to walk a few yards, at most, between her front door and her care providers' vehicles.

153.    K.G. was accustomed to this routine.

154.    K.G. was familiar with the area surrounding her mobile home.

155.    To comply with Defendant Law's Parking Policy that prohibits all tenant invitees, including medically necessary in-home care providers, from parking any vehicle within the bounds of its mobile home parks at any time, K.G.'s care providers were required to park on 43rd Street outside of Demar Park and walk with K.G. back to the home.

156.    This option is not in K.G.'s best interests and is not safe for K.G. given her disability.

157.    K.G.'s Medicaid Individual Support Plan requires that K.G. be within an arm's length of her care providers at all times because K.G. has absconded in the past, placing K.G. in danger.

158.    K.G.'s Individual Support Plan requires K.G. to be supervised at all times and never left alone.

159.    K.G. experiences a significantly heightened state of agitation if her routine is altered.

160.    K.G. expresses this agitation by throwing herself to the ground, screaming, and physically harming herself.

161.    When K.G.'s care providers attempted to park on the street outside of Demar Park to avoid wheel booting and towing, on at least one (1) occasion, K.G. has become so agitated that she threw herself to the ground, screaming, and physically harming herself.

162.    On at least three (3) occasions since the Parking Policy has been in effect, K.G. has thrown herself to the ground on the sidewalk on 43rd Street after her care provider attempted to bring K.G. out of the vehicle to walk to K.G.'s mobile home.

163.    On at least one (1) occasion since the Parking Policy has been in effect, K.G. has thrown herself on the ground, in the lane of traffic on 43rd Street.

164.    K.G.'s care providers are required to keep K.G. safe, and are at risk, in their individual capacities, of civil, administrative, and/or criminal penalties if K.G. is harmed in a manner that was foreseeable and preventable.

165.    Because K.G. does not have a vehicle, there is ample space for care providers to park a vehicle at K.G.'s home.

166.    Defendant Law's Parking Policy created an unsafe and untenable circumstance for K.G. and her caregivers.

167.    After receiving the *August 2017 Letter*, Plaintiff requested a reasonable accommodation from Defendant Law on behalf of K.G., namely Plaintiff requested that the parking spaces on K.G's lot be exempt from Defendant Law's Parking Policy to allow K.G.'s

medically necessary in-home care providers to resume parking at K.G.'s home ("*First Reasonable Accommodation Request*").

168.   In response to the *First Reasonable Accommodation Request*, Defendant Vaughn responded that K.G. could have a parking permit for any vehicle she owns but "all the other people we've asked to be parked out on the main road which is not a bad thing, you know everybody can walk, you know, even a block to get to her trailer. . .."

169.   Defendants denied Plaintiff's *First Reasonable Accommodation Request*.

170.   Defendant Vaughn has asked Plaintiff "why can't [K.G.'s care providers and K.G.] walk?"

171.   Defendant Law's Parking Policy changed K.G.'s routine and created upheaval for K.G. due to her disabilities.

172.   Some of K.G.'s medically necessary in-home care providers opted to park at K.G.'s mobile home in violation of the Parking Policy to comply with the requirements set forth in K.G.'s Medicaid plan.

173.   K.G.'s medically necessary in-home care providers have had their vehicles booted because they parked at K.G.'s home for K.G.'s safety.

174.   Several of K.G.'s medically necessary in-home care providers have quit providing services for K.G. due to the Parking Policy.

175.   Changes in K.G.'s caregivers cause turmoil and agitation for K.G. as she must become accustomed to new people which is difficult for her.

176.   The single entrance to Demar Park is very near the intersection of N. Adams Street and E. 43rd Street.

177.   Because of the Parking Policy, invitees of Demar Park, including medically necessary in-home care providers, must park their vehicles on either side of E. 43rd Street, which can create a "funnel effect."

178.   Drivers often exceed the speed limit on E. 43rd Street.

179.   Substantial numbers of parked vehicles on both sides of E. 43rd Street can make it difficult for drivers to see pedestrians, or individuals entering or exiting vehicles.

180.   Vehicles parked at the entry of Demar Park cause visual obstructions which can result in traffic accidents.

181.   At times, K.G.'s medically necessary in-home care providers were forced to park on the opposite side of E. 43rd Street to be as close as possible to Demar Park for K.G.'s benefit.

182.   At times, K.G.'s medically necessary in-home care providers had to carry groceries, equipment, or other large items from E. 43rd Street to K.G.'s mobile home.

183.   Severe weather is disturbing to K.G. and causes her further agitation.

184.   Defendant Law does not provide snow and ice removal in Demar Park.

185.   It was foreseeable that K.G. could be harmed by a speeding driver on 43rd Street because K.G. could not care for her own physical safety.

186.   It was foreseeable that K.G. could be harmed when she throws herself to the ground due to the agitation that resulted when she was asked to walk to her mobile home from 43rd Street.

187.   It was foreseeable that K.G. could be harmed as her care provider attempted to assist K.G. in crossing 43rd Street.

188.   It was foreseeable that K.G. could be harmed if her care provider was struck by a vehicle on 43rd Street because K.G. is unable to care for her own safety or ask for help.

189.    After several months of unnecessary difficulties imposed on K.G. and her medically necessary in-home care providers, and several requests by both Plaintiff and the owner of the home health agency for reasonable accommodation made to Defendant Law and Defendant Vaughn on behalf of K.G. to exempt K.G.'s lot and home from the Parking Policy, Ms. Vaughn denied the requests, allowing only one parking permit to be issued to K.G.'s medically necessary in-home care providers to share.

190.    The care providers must trade the one parking permit at the end of each shift in K.G.'s home.

191.    On at least two occasions, the care providers have forgotten to trade the parking permit at the end of a shift.

192.    On at least two occasions, K.G. has received a $50.00 lease violation notice fee for her medically necessary in-home care staff parking at K.G.'s home without a parking permit due to a care provider leaving K.G's home with the tag still in the care provider's car.

193.    On or about June 12, 2019, one of K.G.'s in-home care providers left K.G.'s home with the parking permit after having forgotten to trade the permit to the next care provider coming onto the next shift in K.G.'s home.

194.    The care provider, having knowledge of Defendant Law's constant monitoring of the mobile home parks for parking violations, was vigilant in watching for Defendant Law's representative to drive through.

195.    Sure enough, Defendant Vaughn appeared outside K.G.'s home and began taking photos of the lot and the medically necessary in-home care provider's vehicle, parked in the curtilage of K.G.'s home.

196.    The care provider attempted to explain to Defendant Vaughn that the parking

permit had been mistakenly taken by the previous care provider that day and was being returned.

197.    Ms. Vaughn stated to the care provider that she was "not welcome" in the park without the permit and that there were no exceptions to Defendant Law's rules.

198.    The care provider expressly stated that she was at the home to provide medically necessary in-home care to K.G. reminded Defendant Vaughn that K.G. is a disabled person, and requested a reasonable accommodation--to be exempt in that instance from enforcement of the Parking Rules--on account of K.G.'s disability and medical necessity.

199.    Defendant Vaughn stated that it didn't matter and that K.G. would be fined for the unpermitted vehicle parked inside of Demar Park.

200.    K.G. received a $50.00 lease violation notice fine.

201.    Defendants denied the request for reasonable accommodation.

202.    Such tenant lease violation notice fines are assessed against Defendant Law's mobile home tenants so often that when paying K.G.'s monthly rent to Defendant Law, Plaintiff pays additional money for fear of unconscionable fee and penalty escalations.

203.    Plaintiff must maintain a positive balance on K.G.'s rental account to prevent Defendant Law from adding continuous and unreasonable fees to any fine Defendant Law assesses against K.G.

### *Notice, Demand, and Addional Requests for Reasonable Accommodation*

204.    On July 26, 2018, Plaintiff and other tenants of Defendant Law's mobile home parks sent Defendant Law a letter entitled "Notice, Demand, & Reasonable Accommodation" ("*Second Written Reasonable Accommodation Request*").

205.    The *Second Written Reasonable Accommodation Request* included a Request for Reasonable Accommodations on behalf of disabled tenants and their invitees pursuant to Fair

Housing Act, 42 U.S.C. § 3604.

206.    The *Second Written Reasonable Accommodation Request* put Defendant Law on notice that "the Fair Housing Act . . . makes it unlawful to discriminate in the terms, conditions, privileges, or in the provision of services or facilities in connection with the rental of dwellings."

207.    The *Second Written Reasonable Accommodation Request* put Defendant Law on notice that the Fair Housing Act "prohibits housing practices that have a discriminatory effect, even if the practice was not motivated by discriminatory intent."

208.    The *Second Written Reasonable Accommodation Request* put Defendant Law on notice that a "practice has a discriminatory intent where it actually or predictably results in a disparate impact in a group of persons."

209.    The *Second Written Reasonable Accommodation Request* requested that Defendant Law not "fine, boot, tow or otherwise take any adverse action against any disabled tenant, or against any disabled tenant's invitee for parking."

210.    Defendant Law did not respond to the *Second Reasonable Accommodation Request*.

211.    Defendant Law did not make changes to its implementation of the Parking Policy.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**For Violations of The Fair Housing Act 42 U.S.C. § 3604(f)**

*By Plaintiff Against All Defendants*

212.    Plaintiff incorporates all preceding allegations by reference as though fully set forth *in haec verba*.

213.    K.G. has been disabled at all times relevant herein.

214.     Plaintiff is a person associated with K.G.

215.     The Defendants have discriminated in the terms, conditions and privileges of the sale or rental of a dwelling, and the services and facilities in connection therewith, on the basis of "handicap."

216.     Defendants knew or reasonably should have known of KG's disabilities.

217.     Accommodation of K.G.'s disabilities by allowing her medically necessary in-home care providers to park at K.G.'s home without threat of fines, booting, or towing is both reasonable and necessary to afford K.G. an equal opportunity to use and enjoy the premises.

218.     Plaintiff, and others in association with K.G., requested that Defendants make this reasonable accommodation.

219.     Defendants, acting personally or through others, refused and continued to refuse to make reasonable accommodations of K.G.'s disabilities.

220.     The reasonable accommodations requested will not impose an unreasonable financial and/or administrative burden on Defendants and/or Defendants' business(es).

221.     Defendants, acting personally or through others, engaged in and continue to engage in discriminatory housing practices, despite Plaintiff and other mobile home park tenants' notice to Defendants that Defendant Law's policies and practices are in violation of the Fair Housing Act.

222.     Defendants' discriminatory conduct is willful and intentional and exhibits reckless or callous indifference for the rights of the victims.

223.     Because K.G. has been injured by Defendants' discriminatory housing practices, K.G. is an aggrieved person.

224.     K.G. has suffered a loss of her federal civil rights; embarrassment, humiliation,

and other emotional distress; and exacerbation of her disabilities as a result of Defendant Law's Parking Policy and Defendant Law's refusal, through Defendant Vaughn, to provide reasonable accommodations for K.G.

225.    Upon information and belief, Defendants' violations of fair housing laws, including the Fair Housing Act, have been numerous and routine; previous enforcement efforts, including in federal court, have been inadequate to compel subsequent compliance with the Act, warranting affirmative relief. 42 U.S.C. § 3613.

<u>SECOND CAUSE OF ACTION</u>

**For Violations of The Manufactured Home Residency Act**
**I.C. § 55-2001 *et seq.***

*By Plaintiff Against Defendant Law and Defendant Hoffer*

226.    Plaintiff incorporates all preceding allegations by reference as though fully set forth *in haec verba.*

227.    Defendant Law is a "Landlord" pursuant to I.C. § 55-2003(6).

228.    Defendant Hoffer is a "Landlord" pursuant to I.C. § 55-2003(6).

229.    Defendant Vaughn is a "Landlord" pursuant to I.C. § 55-2003(6).

230.    Defendant Law is a "Manager" pursuant to I.C. § 55-2003(8).

231.    Defendant Vaughn is a "Manager" pursuant to I.C. § 55-2003(8).

232.    The form lease agreement used by Defendant Law, and signed by Plaintiff is a "Rental Agreement" pursuant to I.C. § 55-2003(15).

233.    K.G. is a "Resident" pursuant to I.C. § 55-2003(16).

234.    Demar Park is a "Community" pursuant to I.C. § 55-2003(2).

235.    The Manufactured Home Residency Act governs Defendants' duties and

obligations in their ownership and management of mobile home parks, including Demar Park.

236.     Defendant Law's Parking Policy violates I.C. § 55-2008(2) because Defendants did not provide its mobile home tenants ninety (90) days' notice in writing of the rule change.

237.     Defendant Law's Parking Policy violates I.C. § 55-2008(3) because Defendants Law and Vaughn do not "fairly and uniformly" enforce the Parking Policy.

238.     Upon information and belief, Defendant Law's Parking Policy is in violation of I.C. §§ 55-2008(1) and 55-2005(1) because, to date, the Parking Policy and its provisions and penalties are not provided as part of the Rental Agreements Defendant Law requires new tenants to execute or the Community Rules provided to new tenants.

239.     Upon information and belief, Defendant Law's Parking Policy is in violation of I.C. § 55-2005(1) because, to date, the Parking Policy and its provisions and penalties are not provided as part of the Rental Agreements Defendant Law requires new tenants to execute.

240.     Defendant Law's Parking Policy "unreasonably restricts access to the communit[ies] by invitees of . . . resident[s]" of the mobile home parks, including Demar Park, in violation of I.C. § 55-2007(2)(c).

241.     Defendant Law's Parking Policy is unenforceable pursuant to I.C. §§ 55-2008(1), 55-2008(2), 55-2005(1), and 55-2007(2)(c).

## **RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.     For a declaration that all Defendants have violated the Fair Housing Act, 42 U.S.C. § 3604(f);

2.     For a declaration that Defendants Law and Hoffer have violated the provisions of the Manufactured Home Residency Act identified herein;

3.      For temporary, preliminary, and permanent injunctive relief ordering Defendants to immediately, and within 24 hours of judgment or order by this Court, rescind the Parking policy in all mobile home parks under the control of Defendants;

4.      For temporary, preliminary, and permanent relief against all practices, breaches, and violations of law complained of herein;

5.      For an order enjoining the Defendants, their officers, employees, agents, successors, and all other persons in active concert or participation with said Defendants, from failing or refusing to comply with all requirements of the FHA and its implementing regulations;

6.      For affirmative relief pursuant to 42 U.S.C. § 3613(c) requiring the Defendants to:

    a.  arrange for and, along with their partners, agents, employees, assignees and all persons acting in concert with or participating with them, attend, at Defendants' own expense, training regarding fair housing obligations and reasonable accommodation obligations of housing providers under the Fair Housing Act and its implementing regulations;

    b.  within thirty (30) days of the entry of an order require Defendants to develop internal policies ensuring ongoing and future compliance with all requirements of the Fair Housing Act and its implementing regulations;

    c.  within thirty (30) days of the entry of an order to submit for the Court's approval an "Anti-Discrimination Addendum" of not more than two (2) pages that clearly and plainly informs Defendants' existing and future tenants of their rights under the Fair Housing Act and that includes prominently the names, phone numbers, and internet website addresses of fair housing organizations, including Intermountain Fair Housing Council

and Housing, DisAbility Rights Idaho, and Urban Development (after first having gained written permission and approval of the form from the organizations themselves); and

d. within thirty (30) days of the Court's approval of the immediately aforementioned "Anti-Discrimination Addendum," an order requiring Defendants to include the "Anti-Discrimination Addendum" in all future leases entered into with tenants, and requiring Defendants to send a copy of the "Anti-Discrimination Addendum" to each and every existing tenant;

7.      For an order requiring Defendants to reimburse Plaintiff for all costs incurred since August 2017 originating or in any way resulting from (1) lease violation notice fines and other associated and compounded fees, fines, and or penalties associated with "violations" of Defendant Law's Parking Policy by K.G. and K.G.'s invitees; (2) fines, fees, and/or penalties imposed by towing and/or booting of K.G.'s invitee's vehicles; (3) fees imposed by Defendants for replacement and/or additional parking permits, and/or (4) any other fee, fine, cost, and/or penalty incurred by K.G.'s invitees related to Defendant Law's Parking Policy;

8.      For actual damages in an amount to be proven at trial, but not less than $500.00;

9.      For compensatory damages in the amount proven at trial but not less than $160,000.00;

10.      For an award of treble damages pursuant to Idaho Code I.C. § 55-2017 or other applicable law;

11.      For Plaintiff's reasonable costs, disbursements, and attorney's fees incurred herein pursuant to 42 U.S.C. § 3613, and I.C. § 55-2018, and/or other applicable law;

12.      For punitive damages in an amount to be determined at trial, but not less than

COMPLAINT AND DEMAND FOR JURY TRIAL                    28

$100,00.00;

13.     For Defendants' to be held jointly and severally liable for any and all damages, including an award of attorney's fees and costs, awarded in this proceeding; and,

14.     For such other and further relief as to the Court deems just and equitable.

## **JURY DEMAND**

Trial by jury is hereby demanded for all issues properly triable by jury.

DATED this 15th            day of August 2019

ERTZ JOHNSON, LLP

/s/Eileen R. Johnson_____
Eileen R. Johnson
*Attorneys for Plaintiffs*
